IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| ERna KIESSLING and<br>WILLIAM KIESSLING,<br><br>          Plaintiffs,<br><br>          vs.<br><br>KIAWAH ISLAND INN<br>COMPANY LLC, d/b/a Kiawah<br>Island Golf Resort,<br><br>          Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 2:17-cv-02146-DCN<br><br>**ORDER** |

       This matter comes before the court on defendant Kiawah Island Inn Company LLC's ("KIIC") motion for summary judgment, ECF No. 40, and motion to exclude the testimony of plaintiffs' ("the Kiesslings") proposed expert, ECF No. 41, and the Kiesslings' motion to amend the scheduling order, ECF No. 46. For the reasons set forth below, the court grants KIIC's motion for summary judgment as to the negligence claim, denies KIIC's motion for summary judgment as to the strict liability and breach of warranty claims, denies KIIC's motion to exclude the Kiesslings' proposed expert testimony, and finds the Kiesslings' motion to amend moot.

## I. BACKGROUND

       This case arises out of Mrs. Kiessling's contraction of a food-borne illness. The Kiesslings went on vacation with their adult daughter ("Mrs. Baker") and her family ("the Bakers") to Kiawah Island from June 7, 2015 to June 15, 2015. Both families brought their dogs on the trip. On their drive to Kiawah, the Bakers ate at Chick-fil-a. The Bakers and the Kiesslings ate most of their meals at their vacation house. On June 11,

1

the Kiesslings and the Bakers went on a guided nature tour to Bull's Island. The tour included walking around the island and looking at wildlife. After the tour, they had dinner at Bessinger's Barbecue. At some point during the vacation, the Bakers ate again at Chick-fil-a, and the Kiesslings ate at McDonald's. On June 14, the family dined at the Jasmine Porch Restaurant, a restaurant located at the Kiawah Island Golf Resort and owned by KIIC. Mrs. Kiessling and Mrs. Baker ordered flounder, Mr. Kiessling ordered chicken, Mr. Baker and his daughter ordered tile fish, and the Bakers' son ordered steak. The family ate around 8:00 or 9:00 p.m.

Around 2:00 a.m. on June 15, Mrs. Baker started to have diarrhea, the shakes, the chills, and a fever. She says she vomited and spent the night and early morning in the bathroom. Later that morning, around 8:00 a.m., the Kiesslings left Kiawah to return home. They took a rest stop in North Carolina around four or five hours later, and Mrs. Kiessling started to feel sick with a fever and pain in her right knee and left ankle. Mr. Baker and the Bakers' daughter also got sick on June 15 with mild diarrhea, but their symptoms were gone in about a day and a half.

Both Mrs. Kiessling and Mrs. Baker went to emergency rooms in Wisconsin and South Carolina, respectively, and both had a bacteria called Campylobacter in their stool. Mrs. Kiessling's doctors also diagnosed her with reactive arthritis, which the Kiesslings contend is a side effect of the Campylobacter infection.

On August 14, 2017, the Kiesslings filed suit, naming Kiawah Real Estate Company LLC and CCA Financial LLC as defendants. Then on March 7, 2018, the Kiesslings filed an amended complaint to change the defendant to be KIIC, and on June 1, 2018, the Kiesslings filed a second amended complaint to more clearly identify their

claims. The claims in the second amended complaint are for negligence and recklessness, breach of warranty, and strict liability.

On July 25, 2018, KIIC filed its motion for summary judgment, ECF No. 40, and motion to exclude the Kiesslings' proposed expert, ECF No. 41. The Kiesslings responded to both motions on August 31, 2018, ECF No. 45, and KIIC replied on September 6, 2018, ECF No. 48. The Kiesslings also filed a motion to amend the scheduling order on August 31, 2018. ECF No. 46. The court held a hearing on the motions on November 30, 2018. On December 21, 2018, the court entered the fourth amended scheduling order, making the Kiesslings' motion to amend moot. ECF No. 53. The motion for summary judgment and the motion to exclude are now ripe for review.

## II. STANDARD

Summary judgment shall be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. at 248. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. Rule 56(c) requires summary judgment when the party who bears the

burden of proof "fails to make a showing sufficient to establish the existence of an element essential to that party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The court should view the evidence in the light most favorable to the non-moving party and draw all inferences in its favor. Anderson, 477 U.S. at 255.

### III. DISCUSSION

#### A. Motion for Summary Judgment

KIIC argues that the Kiesslings are unable to prove that the flounder served by KIIC caused Mrs. Kiessling's injuries—an element in each of their negligence, warranty, and strict liability claims—and that as a result, all claims must fail. The Kiesslings contend that their expert, Dr. William Robert Jarvis ("Jarvis"), will provide the causation evidence, and that the case will be a "battle of experts." ECF No. 45 at 1.

##### 1. Negligence Claim

The Kiesslings' first claim against KIIC is for negligence. Under South Carolina law, the elements of negligence include: "(1) a duty of care owed by the defendant to the plaintiff; (2) a breach of that duty by a negligent act or omission; and (3) damage proximately resulting from the breach of duty." Talkington v. Atria Reclamelucifers Fabrieken BV, 152 F.3d 254, 263 (4th Cir. 1998) (citing Rickborn v. Liberty Life Ins. Co., 468 S.E.2d 715, 720 (S.C. 1996)). Importantly, South Carolina law does not recognize the doctrine of res ipsa loquitur, meaning a plaintiff asserting negligence must prove that the defendant caused her injury. Crider v. Infinger Transp. Co., 148 S.E.2d 732, 734–35 (S.C. 1966). In addition, the Kiesslings allege that KIIC was negligent in part by violating S.C. Code Ann. § 39-25-30, which prohibits the sale of adulterated food. While the violation of a statute can constitute negligence per se, the violation can only

support recovery if it proximately caused the plaintiff's injury. <u>Coward v. Borden Foods, Inc.</u>, 229 S.E.2d 262, 263 (S.C. 1976).

Here, even assuming Jarvis's opinion is admitted, the Kiesslings cannot prove their negligence claim as a matter of law. Jarvis opines that the Campylobacter came from the flounder, but there is no evidence that KIIC <u>caused</u> the Campylobacter to infect the flounder with Campylobacter, causing Mrs. Kiessling's injury. As KIIC explained in its motion for summary judgment and the Kiesslings conceded at the hearing, there is no evidence that KIIC's preparation of the flounder that was served to Mrs. Kiessling caused her injuries. Because South Carolina does not recognize res ipsa loquitur, this absence of evidence is fatal to the Kiesslings' negligence claim. Moreover, even when the Kiesslings plead their negligence claim as negligence per se through a violation of S.C. Code Ann. § 39-25-30, they still must prove causation, which they cannot do. Therefore, the court grants KIIC's motion for summary judgment as to the Kiesslings' negligence claim.

### 2. Strict Liability Claim

The Kiesslings also levy a statutory strict liability claim against KIIC. Pursuant to S.C. Code Ann. § 15-73-10, the seller of a product is liable for the harm caused by the product when (1) the product is "in a defective condition unreasonably dangerous to the user"; (2) "[t]he seller is engaged in the business of selling such a product"; and (3) the product reaches the user in the substantially same condition in which it was sold. Here, unlike the negligence claim, the Kiesslings do not need to prove that KIIC caused the flounder to be contaminated with Campylobacter. However, they do still need to prove that the product sold by KIIC, namely, the flounder, was unreasonably dangerous and that

5

it was the cause of Mrs. Kiessling's injury. This is what Jarvis's testimony seeks to establish; therefore, this claim can only survive summary judgment if Jarvis's testimony is admissible.

### 3. Breach of Warranty Claim

The Kiesslings' final claim against KIIC is a breach of warranty. Similar to a strict liability claim, the plaintiff must prove that "the product, as designed, was in a defective condition unreasonably dangerous to the user when it left the control of the defendant, and the defect caused his injuries." Miles v. DESA Heating LLC, 2012 WL 1038677, at *8 (D.S.C. Mar. 28, 2012) (citing Madden v. Cox, 328 S.E.2d 108, 112 (S.C. Ct. App. 1985)). Again, the Kiesslings' only evidence that the flounder was dangerous and caused Mrs. Kiessling's injury is Jarvis's testimony.

The Kiesslings concede that without Jarvis's testimony, "they cannot meet their burden, even at the summary judgment stage." ECF No. 45 at 8. As a result, the key inquiries are to determine whether Jarvis is qualified to provide his expert opinion on causation and whether his opinion is reliable. If he is, then the summary judgment is not appropriate for the strict liability and breach of warranty claims at this time.

### B. Motion to Exclude Proposed Expert

KIIC advances several arguments against the admission of Jarvis's testimony, each focused on either Jarvis's qualifications or his reliability. The court addresses each in turn.

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

District courts serve as gatekeepers for expert testimony. The court has a "special obligation" to ensure that expert testimony is relevant and reliable. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999).

Under Daubert v. Merrell Dow Pharmas., Inc, 509 U.S. 579 (1993) the court must address two questions: first, whether the expert's testimony is based on "scientific knowledge"; and second, whether the testimony "will assist the trier of fact to understand or determine a fact in issue." Id. at 592. The first question is answered by assessing "whether the reasoning or methodology underlying the testimony is scientifically valid." Id. at 592–93. Several nondispositive factors should be considered in determining the reliability of a particular scientific theory or technique: whether it (1) can be and has been tested; (2) has been subjected to peer review and publication; (3) has a known or potential rate of error; and (4) has attained general acceptance in the pertinent scientific community. See id. at 593–94. In considering these factors, the focus "must be solely on principles and methodology, not on the conclusions that they generate." Id. at 595. The factors are not exclusive; what factors are relevant to the analysis "depends upon the particular circumstances of the particular case at issue." Kumho Tire, 526 U.S. at 150.

The second inquiry "goes primarily to relevance." Daubert, 509 U.S. at 591. Relevance is determined by ascertaining whether the testimony is sufficiently tied to the

facts of the case such that it will aid the jury in resolving a factual dispute. Id. at 593. "A review of the caselaw after Daubert shows that the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, Advisory Committee's Note to 2000 Amendments. "Daubert did not work a 'seachange over federal evidence law,' and 'the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system.'" Id. (quoting United States v. 14.38 Acres of Land Situated in Leflore Cnty., 80 F.3d 1074, 1078 (5th Cir. 1996)).

### 1. Jarvis's Qualifications

KIIC challenges Jarvis's qualifications to serve as an expert in this case because of his lack of specific experience with Campylobacter. The Kiesslings responded to KIIC by providing Jarvis's CV in an effort to show that Jarvis is an experienced infectious disease specialist and epidemiologist who is qualified to serve as an expert about food borne illnesses. Moreover, the Kiesslings point to a series of questions and answers in Jarvis's deposition transcript in which they contend Jarvis proves his knowledge about Campylobacter and its connection to gastroenteritis and reactive arthritis. The court finds that Jarvis is sufficiently qualified to provide an opinion in this case.

When determining if an expert's qualifications are sufficient under Daubert, the court should "'consider the proposed expert's full range of experience and training,' not just his professional qualifications." Belk, Inc. v. Meyer Corp., U.S., 679 F.3d 146, 162 (4th Cir. 2012) (quoting United States v. Pansier, 576 F.3d 726, 737 (7th Cir. 2009)). "Generally, the test for exclusion is a strict one," and "[o]ne knowledgeable about a particular subject need not be precisely informed about all details of the issues raised in order to offer an opinion." Thomas J. Kline, Inc. v. Lorillard, Inc., 878 F.2d 791, 799

(4th Cir. 1989) (citing Martin v. Fleissner GMBH, 741 F.2d 61, 64 (4th Cir. 1984)); see also Deutsch v. Novartis Pharm. Corp., 768 F. Supp. 2d 420, 425 (E.D.N.Y. 2011) ("If the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent." (quoting In re Zyprexa Prods. Liab. Litig., 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007))). It is "well-settled that gaps in an expert's knowledge generally go to the weight of the witness's testimony, not its admissibility." N.O. v. Alembik, 160 F. Supp. 3d 902, 908 (E.D. Va. 2016).

Courts have generally found experts to lack the requisite qualifications only when the proposed expert clearly has no relevant qualifications. See Thomas J. Kline, Inc., 878 F.2d at 799 (proposed expert for credit and price discrimination case not qualified because she was not an economist, had published nothing about price discrimination, credit, or antitrust, worked primarily on analyzing companies' financial health, and had no personal experience making credit decisions); Zellers v. NexTech Ne., LLC, 533 F. App'x 192, 197 (4th Cir. 2013) (proposed expert seeking to testify to the cause of plaintiff's medical symptoms as being exposure to toxic gas not qualified because she was a neurologist with no training in the field of toxicology and her knowledge of gas toxicity simply came from articles downloaded from the Internet).

Jarvis plans to testify as an expert in infectious diseases. Jarvis Depo. 7:15–17. He began working with infectious diseases as a teaching fellow after obtaining his MD and completing his residency. Id. 14:16–15:25. Jarvis then got a post-doctoral fellowship in infectious diseases and continued his career working at the Center for

9

Disease Control.  Id. 16:24–18:7.  While he has never testified in a food-borne illness case before, id. 11:14–16, his infectious disease training included Campylobacter, and he has treated cases of Campylobacter.  Id. at 25:14–26:4.  In addition, Jarvis discussed his knowledge of Campylobacter throughout the deposition.  Id. at 33:16–37:21.  Based on Jarvis's medical training, his experience working with infectious diseases, and his knowledge about Campylobacter, he is qualified to testify as an expert in infectious diseases.  While he is not a specialist in Campylobacter, Daubert does not require that the witness have "expertise in the specialized areas that are directly pertinent."  Deutsch, 768 F. Supp. 2d at 425.  If there are any gaps in Jarvis's knowledge about Campylobacter, it is an issue for the jury.

### 2. Jarvis's Reliability

Next KIIC argues a variety of reasons why Jarvis's opinion is unreliable.  While the basis of Jarvis's opinion is not particularly robust, the court finds that it is sufficiently reliable to be heard by a jury.

#### i. Failure to Consider Certain Facts

KIIC first contends that Jarvis's opinion is not reliable because he failed to consider deposition testimony from Mrs. Baker regarding the timing of her symptoms.  KIIC says this is relevant because the time between Mrs. Baker consuming the flounder and displaying symptoms of digestive issues is too short of an incubation period for Campylobacter, suggesting the Campylobacter did not come from the flounder.  The Kiesslings argue that it is not fatal that Jarvis had not reviewed Mrs. Baker's deposition prior to his own deposition because he has since read her deposition, and he will testify at trial that it provides further support for his opinion.

10

Federal Rule of Evidence 702 requires that experts base their opinions on "sufficient facts or data." Fed. R. Evid. 702. "It follows that an opinion based on an inadequate or inaccurate factual foundation cannot be a reliable opinion, no matter how valid the principles and methods applied or how well-qualified the expert." Fernandez v. Spar Tek Indus., Inc., 2008 WL 2185395, at *6 (D.S.C. May 23, 2008). However, in some cases, whether an expert should have considered certain facts when forming her opinion goes to the weight of the opinion, not its admissibility. Sparks v. Gilley Trucking Co., Inc., 992 F.2d 50, 54 (4th Cir. 1993); see also Bazemore v. Friday, 478 U.S. 385, 400 (1986) ("Normally, failure to include variables will affect the analysis' probativeness, not its admissibility.").

KIIC points to no case law that says an expert is required to consider all facts in a case when forming his opinion. Instead KIIC relies on a section of Kumho in which the Supreme Court discusses the importance of reliable methodology, 526 U.S. at 157, and an unpublished case in which the court finds an expert's opinion to be unreliable because he bases his opinion on inaccurate facts, Fernandez v. Spar Tek Indus., Inc., 2008 WL 2185395, at *6–7 (D.S.C. May 23, 2008). Neither of these cases require that an expert examine and rely on all facts when forming his opinion.

Here, the fact that Jarvis did not consider Mrs. Baker's opinion does not bear on the reliability of his methodology. The decision to not examine certain evidence goes to the weight of the opinion, not its admissibility. As a result, this factor does not support the exclusion of Javis's testimony.

### ii. Insufficient Methodology

Next KIIC argues that Jarvis's opinions used insufficient methodology—specifically an unnamed article and speculation—to come to his conclusions. The Kiesslings defend Jarvis's methodology by explaining that he reviewed a variety of sources to come to his opinion, including medical records, witness testimony, peer-reviewed studies, and medical literature.

"In order to be considered reliable, an expert's opinions must reflect 'scientific knowledge,' be 'derived by scientific method,' and be the result of work product that amounts to 'good science.'" In re Bausch & Lomb, Inc. Contact Lens Sol. Prod. Liab. Litig., 2009 WL 2750462, at *9 (D.S.C. Aug. 26, 2009) (quoting Daubert, 509 U.S. at 590, 593). Daubert requires that "experts are held to the same rigorous standards in the courtroom that they are held to in the scientific community." Id. "The Supreme Court provided four non-exclusive factors for use in analyzing scientific reliability:"

> 1. Testing: whether the theory can be, and has been, tested;
>
> 2. Peer Review and Publication: whether the theory has been subjected to peer review or publication;
>
> 3. Rate of Error: the known or expected rate of error of the expert's methodology; and
>
> 4. General Acceptance: whether the methodology has been generally accepted by the relevant scientific community as reliable for the purpose for which it is employed.

Id.

An important aspect of Jarvis's methodology is his use of differential diagnosis. The Fourth Circuit has held that "reliable differential diagnosis provides a valid foundation for an expert opinion." Westberry v. Gislaved Gummi AB, 178 F.3d 257, 263 (4th Cir. 1999). This methodology involves "determining the possible causes for the

patient's symptoms and then eliminating each of these potential causes until reaching one that cannot be ruled out or determining which of those that cannot be excluded is the most likely." Id. A reliable differential diagnosis "must first 'rule in' a plaintiff's proposed cause and then 'rule out' alternative causes." In re Bausch & Lomb, Inc. Contacts Lens Solution Prods. Liab. Lit., 693 F. Supp. 2d 515, 519 (D.S.C. 2010) (quoting Foster v. Legal Sea Foods, Inc., 2008 WL 2945561, at *10 (D. Md. July 25, 2008)). "'Ruling in' a cause, also known as proving 'general causation', 'is established by demonstrating that exposure to a substance can cause a particular disease.'" Id. (quoting Foster, 2008 WL 2945561, at *10).

For example, in Foster, the plaintiffs alleged that they contracted Hepatitis A from eating mussels served at Legal Sea Foods. 2008 WL 2945561, at *1–2. The plaintiffs' expert proposed to testify that the mussels from Legal Sea Foods were the source of the Hepatitis A, and the defendants moved to exclude his testimony on the basis of an unreliable differential diagnosis. Id. at *2–3, *10. While the court explained that it was "a close question" determining if the expert reliably eliminated other potential causes, it identified the key issue being the lack of evidence that the expert sufficiently "ruled in" the mussels as the cause. Id. at *11. The court explains that the expert solely relied on the plaintiff's description of the mussels appearing undercooked, and that instances of Hepatitis A in mussels is "extremely low or nonexistent," while "other food sources are rare, but more likely than mussels." Id. As a result, the court excluded the expert's testimony. Id.

Moreover, "a literature review can be an appropriate part of a method in determining general causation." Doe v. Orth-Clinical Diagnostics, Inc., 440 F. Supp. 2d

465, 472 (M.D.N.C. 2006). However, when a literature review "consists of attempting to connect various individual studies that have developed the existence of certain findings," this methodology is unreliable. Id. at 473. In Doe, the expert based his opinion in part on a literature review that "consisted of attempting to connect various individual studies that had developed the existence of certain findings" in order to prove causation. Id. The court held that this review did not meet the Daubert standard not only due to the piecemeal nature but also due to the fact that "all of the available peer-reviewed and generally accepted epidemiological studies refute [the] causation" that the expert testified existed. Id. at 474-75.

Another factor considered in causation methodology is temporal relationships. "[D]epending on the circumstances, a temporal relationship between exposure to a substance and the onset of a disease or a worsening of symptoms can provide compelling evidence of causation." Westberry, 178 F.3d at 264. However, "the mere fact that two events correspond in time does not mean that the two necessarily are related in any causative fashion." Id. "An opinion based primarily, if not solely, on temporal proximity does not meet Daubert standards." Roche v. Lincoln Prop. Co., 278 F. Supp. 2d 744, 764 (E.D. Va. 2003).

Whether Jarvis's methodology was reliable is a close call. Jarvis used differential diagnosis to come to his conclusion that the flounder was the source of the Campylobacter. First, Jarvis "ruled in" the flounder as the source of the Campylobacter by claiming that it is possible for the incubation period for Campylobacter to be short enough to fit the time period between the dinner at Jasmine Porch and Mrs. Baker and Mrs. Kiessling displaying symptoms. Jarvis said he relied on an article that had a table

summarizing the range of incubation periods for Campylobacter from different studies as well as the temporal relationship between the dinner and the symptoms.  However, Jarvis could not recall the name of the article nor did he look at the studies that were summarized in the article.  Jarvis also generally opined that incubation periods can vary depending on dosage amounts and individual behavior, such as taking an antacid, but he did not know what dosage Kiessling consumed or if she took an antacid.  While reliance on one article may seem insufficient, Jarvis did not piece together facts from different articles to get to the conclusion he wanted as the expert in Doe did.  The fact that he only relied on one article goes to the credibility of his opinion.  Moreover, he does not base his opinion solely on the temporal relationship between the dinner and the symptoms.  He also considers the fact that Mrs. Baker and Mrs. Kiessling are the only two people who ate flounder and both were infected with Campylobacter.

Next, Jarvis considered alternative sources of the Campylobacter in his deposition and eliminated each until he arrives at cross-contamination at Jasmine Porch as the likely source of the bacteria.  Jarvis Depo. 64–70.  The alternative sources KIIC asked Jarvis about were Bessinger's Barbecue, the Kiesslings' guided nature tour, the families' dogs, Chick-fil-a, McDonald's, and food that the families prepared at the house.  Id.  Jarvis ruled out these potential sources largely based on the fact that other family members were exposed to these sources and did not get sick, while Mrs. Kiessling and Mrs. Baker are the only two people who ate flounder and the only two who were tested for Campylobacter.[1]  Similar to the expert in Foster, Jarvis relied on the plaintiffs' account of

---

[1] KIIC continues to point out that Mr. Baker and the Bakers' daughter exhibited mild symptoms of food poisoning, but it does not appear that the two were ever tested for Campylobacter.

eating the flounder then becoming sick shortly after, and instances of Campylobacter in flounder appear to be extremely rare. Yet there is more of a causal link in the instant case because, as discussed below, Jarvis conducted a literature review to support his opinion, and Mrs. Baker and Mrs. Kiessling are the only two who ate flounder and were found to have Campylobacter. As a result, while Jarvis's methodology may seem underwhelming, it is sufficiently reliable to be heard by the jury.

### iii.  Litigation Driven

KIIC claims that Jarvis's opinion is unreliable in part because it is litigation driven. One of the factors a court should consider in determining if expert testimony is reliable is "whether experts are 'proposing to testify about matters growing naturally and directly out of research they have conducted independent of litigation, or whether they have developed their opinions expressly for the purpose of testifying.'" Fed. R. Evid. 702 Advisory Committee's Note to 2000 Amendments (citing Daubert, 43 F.3d at 1317). An argument that an expert opinion "should be excluded because it was prepared solely for litigation . . . goes to weight, not admissibility of the opinion." Dykes v. Inmate Servs. Corp., 2017 WL 9286983 at *18 (D.S.C. Jan. 23, 2017). It is a factor to consider, but if the opinion is otherwise reliable, an expert opinion should not be excluded on the sole basis that it is litigation driven. Sanchez v. Boston Scientific Corp., 2014 WL 4851989, at * 4 (S.D.W.V. Sept. 29, 2014). Litigation-driven expert testimony can be excluded as unreliable when the expert changed his normal methodologies in order to obtain a particular result. In re: Lipitor (Atorvastatin Calcium) Mktg., Sales Practices and Prods. Liab. Litig., 2016 WL 827067, at *3-4 (D.S.C. Feb. 29, 2016).

To support its contention that Jarvis's opinion is litigation driven, KIIC relies on the arguments it makes about Jarvis's qualifications. KIIC does not point to anything about Jarvis's methodology that suggests he altered his methodology to obtain a certain result. Absent any additional reasons for Jarvis's opinion being litigation driven, there is not a sufficient showing that his opinion is unreliable for this reason.

### iv. Failure to Consider Alternatives

KIIC contends that Jarvis failed to properly consider alternative sources of the Campylobacter. "[I]f an expert utterly fails to consider alternative causes or fails to offer an explanation for why the proffered alternative cause was not the sole cause, a district court is justified in excluding the expert's testimony." Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 202 (4th Cir. 2001). For example, in Cooper, the expert witness ruled out the possibility of smoking causing the nonunion of the plaintiff's vertebrae by simply reading two medical articles about smoking and rejecting them as unpersuasive. Id. at 203. The district court found this to be an insufficient basis for rejecting the alternative, and the Fourth Circuit affirmed. Id. at 203-04.

"However, '[a] medical expert's causation conclusion should not be excluded because he or she has failed to rule out every possible alternative cause of a plaintiff's illness.'" Westberry, 178 F.3d at 265 (quoting Heller v. Shaw Industries, Inc., 167 F.3d 146, 156 (3d Cir. 1999)). Daubert simply requires that an expert "address obvious alternative causes and provide a reasonable explanation for dismissing specific alternate factors identified by the defendant." Id. (quoting Israel v. Spring Indus., Inc., 2006 WL 3196956, at *5 (E.D.N.Y. Nov. 3, 2006)). If an expert meets this threshold, then the failure to investigate potential alternative causes simply affects the weight of the

evidence. Id. ("The alternative causes suggested by a defendant 'affect the weight that the jury should give the expert's testimony and not the admissibility of that testimony,' unless the expert can offer 'no explanation for why she has concluded [an alternative cause offered by the opposing party] was not the sole cause.'") (quoting Heller, 167 F.3d at 156–57).

As discussed previously, Jarvis considered alternative sources of the Campylobacter in his deposition. Jarvis Depo. 64–68. Specifically, KIIC asked Jarvis about Bessinger's Barbecue, the Kiesslings' guided nature tour, the families' dogs, Chick-fil-a, McDonald's and food that the families prepared at the house. Id. Jarvis ruled out these potential sources largely based on the fact that other family members were exposed to these sources and did not get sick, while Mrs. Kiessling and Mrs. Baker are the only two people who ate flounder and the only two who were infected with Campylobacter. As Daubert requires, he "address[es] obvious alternative causes and provide[s] a reasonable explanation" for dismissing them. See Westberry, 178 F.3d at 265. Whether his dismissal of the alternative causes is convincing is a question for the jury.

### v. Analytical Gaps

Finally, KIIC argues that Jarvis made several statements that do not "fit" with the evidence of the case. These statements are that (1) the Campylobacter came from cross-contamination of the flounder when there is no evidence of cross-contamination at Jasmine Porch; (2) the symptoms of Campylobacter can arise under 15 hours when he can only point to one article supporting this conclusion; and (3) Mrs. Kiessling will have reactive arthritis for the rest of her life simply based on literature review and nothing

more. When an expert's opinion "is connected to existing data only by the ipse dixit of the expert," the district court "may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).

Jarvis's cross-contamination conclusion is no longer relevant to this case. The Kiesslings would use this conclusion to show how the Campylobacter ended up in the flounder. However, with the strict liability and breach of warranty claims as the only remaining claims in this case, the Kiesslings will not need to prove how the Campylobacter got into the flounder. Instead, they will simply need to prove that the flounder was the source of Campylobacter that infected Mrs. Kiessling, making the flounder unreasonably dangerous and the cause of Mrs. Kiessling's injuries. Therefore, Jarvis's testimony will not be excluded on this basis.

The incubation period of Campylobacter is discussed above in the methodology section, and despite reliance on just one article, it is still something for Jarvis to base his opinion on and must be considered with the other information that Jarvis used to form his opinion. The sufficiency of the article is a question for the jury.

As for the reactive arthritis, Jarvis said he reviewed Mrs. Kiessling's medical records to determine if she will suffer from reactive arthritis for the rest of her life. Jarvis Depo. 80:4–10. He also mentioned reviewing three articles that discuss reactive arthritis being a well-known complication of Campylobacter infection. Id. 61:22–25. Based on Jarvis's qualifications as a doctor, his review of Mrs. Kiessling's medical records, and the literature he reviewed, there is not an analytical gap in his opinion that Mrs. Kiessling

will suffer from reactive arthritis from the rest of her life. It is a question for the jury to determine if Jarvis's opinion is convincing.

In conclusion, while the reliability of Jarvis's opinion is a close question, the court finds that his opinion is sufficiently reliable to admit into evidence and will let the jury determine its credibility.

### IV. CONCLUSION

For the foregoing reasons, the court **GRANTS** the motion for summary judgment as to the negligence claim, **DENIES** the motion for summary judgment as to the strict liability and breach of warranty claims, **DENIES** the motion to exclude, and finds the motion to amend moot.

**AND IT IS SO ORDERED.**

DAVID C. NORTON
UNITED STATES DISTRICT JUDGE

**January 25, 2019**
**Charleston, South Carolina**